I will ask to reserve three minutes of my time for rebuttal. If it pleases the court, I would like to address first a matter of law regarding the lack of access by the defendants to a testimony of at least one very important witness and two other, the full testimonies of two other witnesses in this case. My client only counts of conviction in this case as an honest service fraud. And these testimonies directly impacted the theory of defense. These three witnesses are Dr. Jimenez, Attorney Valentin, and Mr. Diaz, who all were involved in multiple acts of mishandling numerous tests involving physicians in Puerto Rico. The legal issue here is that since the outset of the case, since the opening argument, the government stated to the jury that it was going to prove the case, particularly the honest service fraud case, based on an allegation of regularity regarding the use of the mails and the way the board, I'm referring to the medical examination board, test the subject. The they were going to prove that the board was in shambles, that the board had no regular process regarding testing, and that basically it was a totally convoluted process. The government was able to sit down their witnesses to testify as to regularity for a significant amount of time. Basically, two secretaries who testified first as authentication witnesses and then as fact witnesses. But then when the defense tried to impeach them regarding other instances, defense was not able to do so. When the government sat down an FBI agent and the defense tried to impeach the agent with all of the other instances as to a lack of regularity and the improper process that was going on at the board, the court didn't allow that either. So then defense, in their turn, asked the court to allow these witnesses to testify for the defense. These three witnesses had signed direct use immunity proffers letters or direct use immunity agreements, all of them. And the defense asked the court to limit the testimony of these witnesses to those immunized testimony. The court made the first error of law by ruling that those witnesses were exposed to a state prosecution, notwithstanding the direct use immunity agreements that they had with the government. So the court then went on and had an individualized voir dire regarding these witnesses. And in the end, the witnesses claimed the Fifth Amendment and most of those testimonies didn't get in during the defense's turn. As a fallback position, the defense then says to the court, let's allow the statements contained in those MOIs of the interviews of the agent or the agents of these two witnesses and the court in another ruling again mistakenly rules that given the fact that the witnesses only had federal immunity under federal rule of evidence 803B and 804, those statements couldn't get in. That's a mistaken ruling of law, some mistaken interpretation of those evidentiary rules, which is court reviews the novel. And besides that, it's in direct contradiction to the rule of the law in the circuit as contained in U.S. v. Maki. The end result of all those incorrect rulings is that the defense was left without access to these three very important witnesses. How was your defense, accepting the proposition that this board was in a shambles and there were a lot of irregularities, I mean, your client is charged with very specific criminal charges involving very specific acts, involving very specific individuals. I mean, how is it, I mean, I understand a concern about the possible distraction, needless consumption of time, confusion of the jury, getting into all that. How is your defense compromised by the court's insistence that we impose some limits on what the inquiry is going to be here? I mean, that's a judgment that a court makes all the time. Yeah. Going to the last part of the question is that the court didn't, my argument is not based on limiting cross-examination or limiting access to witness. The court ruled, and there's two opinions or orders in the record, incorrectly ruling why the defense, even though the court initially felt that those testimonies were irrelevant, then the trial court amended its ruling and said, yeah, it may be relevant, but then refused to allow those testimonies, not based on handling of evidence or, which is abuse of discretion, but based on incorrect rulings of question regarding what's the fact. The first thing I should note is that the government never raised a harmless error regarding this matter. It basically didn't brief the matter. In fact, that's an argument I made in my reply brief. But even assuming that that should be considered, the government's theory to prove the mailing element of the unserviced fraud was, in this case, solely the regularity argument. The government didn't have any evidence as to what mailings were made as to Ms. Pacheco. That was admitted by both of the secretaries who testified. So the government theory as to the use of the mails or furtherance of the use of the mails was based solely upon an inference to the jury that they argued that given that the board had these procedures in place, Ms. Pacheco should have expected that the mails were going to be used for the sending of a notice of whether she passed or failed the test. But there was testimony that in some instances, physicians didn't provide the envelopes or candidates didn't provide the envelopes. There was evidence on other occasions that people visited or some candidates directly visited the temps or the board to get those results. So if we were able to present to the jury those specific instances that we were able to get across, with the additional information regarding not only that the board was in shambles, we're talking direct specific evidence as to specific acts that went not only as to the lack of actual procedures or the lack of security as to the test results, but even as to the certainty of whether my client had really failed or had not passed a review because the board had simply no controls. And the jury, the defense should have had the right to present to the jury that as a theory of defense, and that's a violation of the Fifth and Sixth Amendment rights of our clients. So had your client obtained the necessary professional malpractice insurance in the way that the other clients had by presenting to the relevant entity a certificate that she had passed the exam? That's a very interesting issue, because that factual allegation is contained in the mail fraud count, which my client was acquitted because there was no evidence that there was any mailing made as to her by anyone. My client's only count of conviction was the honest service fraud. And going to that, the evidence as to her basically was an intermediary who contacted Yolanda Rodriguez, who was the person who made the paste and cut copy scheme, and who on multiple occasions was willing to do that scheme without any pay. And in the case of Pacheco, she basically asked Ms. Margarita Vicioso for anything. In Spanish, anything is not anything of value. It's just the other way around. In Spanish, to tell someone, just give me anything, is basically to say, you know what, anything, whatever, if anything. So that's the first. The second regarding the bribe, which is that Ms. Yolanda Rodriguez stated on the record that she received a tiny piece of jewelry, whatever that means. The jewelry was never presented to the jury. Ms. Pacheco asked the government to produce that piece of jewelry. When the government was not able to produce a piece of jewelry, it moved the court for an instruction to the jury regarding a presumption of adverse evidence, suppressed adverse evidence. The court refused. And then Ms. Vicioso, again, also admitted that she told Ms. Pacheco, just give me anything, which turned out allegedly to be $500. Comparing the multiple cases that this court has decided upon, I told you, $500. She, there were different intermediaries between the various defendants and Mr. Solis, is that correct? And Ms. Vicioso. Ms. Rodriguez. I'm sorry? Ms. Rodriguez. Thanks. Yes, that's right. And so, but you're describing one of the, one of the intermediaries, is that correct? Yeah, Ms. Vicioso was one of the intermediaries. All of them asked for anything, which they even mentioned the word gift. And the court, again, did not allow the jury to have a gift instruction as to Ms. Pacheco. And the court should remember, again, that this is the only count of conviction. The jury found that there was no mail fraud in Ms. Pacheco's case, that there was no aggravated identity theft. There's only a single honest service mail fraud, which, again, the court in many ways prevented the defense from having a full case presented to the jury, and ended with that single count of conviction. And I only have 10 seconds left, and I have reserved some of my time, and I will further discuss the matters then. Thank you. Good morning. David, please, the court. David Shaughnessy, appearing for Glenda Gavillo. If I may, I'd like to reserve three minutes of my time. Yes. Thank you. I'd like to return to the questions that Judge Lopez asked Attorney Mariani about what was the significance of this material that was kept from the jury. I think there were a number of ways it was significant, but the most important would be, that what happened at the board was generally unknown to these individual candidates. So what was going on at the board was they didn't know what happened. And the evidence was replete throughout the case that there were all kinds of strange, unusual, mysterious things happening. In fact, almost all of these decisions that were made on whether candidates would pass these tests, once they got into the appeal process, revision process, were all done behind closed doors at the temp, on their own schedule, for their own reasons. And things were being sent out to these candidates from the temp board, and they didn't know what was really going on. And that's important to my client, particularly because my client was convicted, like Mr. Rodriguez, of fraud conspiracy. In order to prove, in order to establish that conviction, the government needed to prove, beyond a reasonable doubt, that my client, Mr. Vila, agreed with Danny Solis to bribe Yolanda Rodriguez to fix her test result. Now, the way the government tried to do it, the only evidence they had, Yolanda Rodriguez testified she had no recollection of my client or doing anything with regard to my client's test. Solis did not testify at all. The only evidence against my client came from the interview that she gave, the statement she made to the prosecutors when she went into their office voluntarily. And you've read that statement. There's nothing in there. There's no mention of what Solis might do, how he might do it. There's no mention of bribing anyone. There's no mention of going to the board. There's no mention of Yolanda Rodriguez. The way the government tried to prove this case was to the regularity. They tried to show that everything happened like clockwork within this board, except for this one glitch with Yolanda Rodriguez. So anything that went haywire was her fault. Now, they weren't entirely successful because, as Mr. Mariani alluded, the judge did allow certain things to come in. But they were so scattered and so insignificant, and the major things were kept away from the jury, the jury was left with the impression, I think, successfully, I think the government succeeded in convincing the jury, hey, everything was great here except for this Yolanda Rodriguez person. So if anybody got any kind of a fake result, that's how it happened. Counselor, Dr. Velez was a critical witness for the prosecution. Isn't he the one who first discovered what appeared to be these fraudulent test results that led to certifications of passage? Am I correct? That's Dr. Velez? He was that important witness to my client, Your Honor. And I'm not sure he's the one who actually discovered it, but he was the one who verified it for the government. He was the one who testified to the basic scheme. I mean, there was evidence, I assume important evidence, that there were these remarkable test results for individuals who had first failed. Isn't that correct? Yes. Like my client, for instance, had taken their basic test, failed it once, took it again, failed it again, took it a third time and passed it. That was all okay. There's no allegations of any propriety with that. As far as the November 2002 clinical test, which is the one at issue here, he had taken that once, failed it, went in, asked for revision, failed in revision, and then took it a second time and failed it, she told that when she went into the government. She said, I failed the test. And my intern, my colleague that I'm working with said, I can help extradite things with the board. Didn't say how, didn't say why, didn't say anything. And she said, thanks, here's $300. And then sometime after, unclear when, sometime after, that man delivered, Solis delivered to my client the test result that she was waiting for, because she was on appeal for her results. She had failed the exam, and she was appealing. And she was in the middle of that appeal process, he approaches her and says, I can move things along. And she says, great, here's $300, thanks. Sometime, excuse me, sometime after that, she, he gives her the test result, pass it. Well, she had no reason to think there was anything wrong. Now, what I suspect may have happened later on when the investigation broke and this became big, big news, and they sent out all the target letters to everyone, and my client went with her lawyer to talk to the government, and tell them what happened, she probably realized, oh, Solis must have done something wrong. Solis must have done something fishy. Well, she didn't know that at the time. So, there was no conspiracy, because she didn't agree with anybody. That was the extent of the evidence against her. The documents, there's lots of documents that were introduced, but they don't show anything. The documents don't show anything. I outlined them in the brief in a tabular form. You can see the whole sequence of events. Well, the documents do show that her test results were copied from, photocopied from someone else's test and had been used for other people. True, your honor. We have conceded, we have conceded that there's, the government has established, presented enough evidence to show that her, the test result she got from Solis was in fact false. We concede that. The question is, when did she realize that? And I'm suggesting that she realized that when the investigation became public, she got a target letter and went to her lawyer and told them what, told the prosecutor what happened. So, the court... When she was, was she asked to pay $300? No. It was unsolicited and that's clear from the... Why didn't she just gave $300? To thank you. I've, I've, I've, along with... And who was, she was thanking... Solis. ...a colleague who said that, that he could expedite, he or she could expedite the process? Right. He was an intern at the hospital and there's no evidence about exactly what his relationship was with other people, but it seems clear that he must have told people, I know somebody, I can help move things along for you. Now, I mean, there's, that's, that's the extent of the evidence. And even that's not even in there because there's no, there's no evidence about the conversation. You have to remember, she was interviewed for 20 minutes by the government. Well, so what if she already knew she had failed the clinical exam? She did. So what does it, what does it mean that I can help you move it along? Does it mean that somehow the test results will be revised in a way that will now allow you to pass? Well, Your Honor, she was in the process of appeal. She was, she was seeking revision when he approached her. Okay. So that, that was exactly what, what ended up happening. So she ended up, she was in, she failed the exam, which she told the government. She was in revision, which she told the government. Solis approached her, which she told the government, and said, and said what he said. And then she, and then she, and then she, then he gave her the test result. But there's no evidence about what she knew he was going to do or why he was going to do it or how it was going to work. There's not, there's not a shred of evidence that any of that $300 was intended to go from Solis to the woman at the board, because Solis was a doctor in the hospital. He was not a public official. If the money wasn't going to the mail fraud here, or conspiracy. I see my time is up. May I please report? Good morning, Your Honor. Rosario de la Cuenca on behalf of Julio Castro. Your Honor, we, we have different issues, but we'll first start with the transcripts. We were at the trial. We were the first of the attorneys to ask for a transcript. Two days before the beginning of the trial, we asked for a transcript. We asked for a transcript on February 8th, on February 12th, on April 1st, on April 18th. One of the- Was, were you representing your client privately or under the CJA? Under CJA, Your Honor. Yes, and the government had, had, had solicited the, the, the, the transcripts, and the court had authorized USA for the transcripts. But since we asked, we, we continued asking for them, we only get partial testimonies of some of the, of the witnesses, but we did not get the, the transcripts as the, as a full. We understand, Your Honor, that the first thing that the judge said on the first day of, of, of jury trial, that she had many cases that she cannot, she would think about it. We filed a second motion. She told me not to remember her every day of the, of the transcripts. And it, it really was damaging to us, Your Honor, because when, on day 40 of the trial, day 40, the jury asked to re-, to, to hear again the testimony of Irina Velazquez, which was the person who had said that she had, my, my client had gave her an envelope that she had touched, she didn't know what was in it, she didn't open it, and she gave it to Danny Solis. What happened after that, nobody knows. And when she said that she thought it was money, that was stricken from the record. And when we re-read her testimony, it was re-read again. And it was also re-read part of the, of a bench discussion. So there was no way that I can know what was going to be re-, re-written, re-read by, by the clerk. And, and we understand that there was a, a, the jury had a doubt in relation to Mr. Castro. And reading, re-reading her testimony, Irina's testimony, it confused the jury, confused the jury, because there was no evidence that there was money in, in, inside the envelope. There was no evidence that Danny Solis gave that envelope to Yolanda. On the contrary, Yolanda said that she did not, she did not know who was, who was Mr. Castro, that she did not remember doing anything for Mr. Castro. And that was Yolanda's testimony. Danny Solis did not testify in favor of the government. Your Honor, we understand that this not, not requesting, not giving us the, the, the trial transcripts violates the due process and the Equal Protection Clause of the, of the Fourteenth Amendment. We understand, Your Honor, that we were not at the same pace or same equal, equally as the government, because our clients are not, the government are, do not have money to pay for the transcript. We were, even for the, for the records, we cannot cite the, the, the testimony of, completely as it was. Did the, did the government have daily transcripts throughout the trial? Yes, Your Honor, it did. And the record shows that? Yes, Your Honor. And the judge was aware of that? Yes, Your Honor. All right. And, and you say you renewed this request for daily transcript three or four times? February 8th, February 12th, April, April 1st, April 18th. Okay. And, and did the judge on those occasions deny it, or did she just never rule? February 8th, she never ruled. February 12th, she didn't rule. April 1st, she just gave me part of Villanmina's redirect, across and redirect. And on April 18th, she only gave us partial, partial transcripts. But constantly, Your Honor, in court, I would get up, and I would ask for the transcripts, and she would just tell me to sit down. First, she told me not to bother her every day for the transcript, that she had many cases that she couldn't, she had other cases that she had to take care of. So, we understand, Your Honor, that, that, that the, not having the trial transcripts for a 42-day trial, which is not 42 days, one day after the other, it's, it's in different days, it violated Mr. Castro's due process and his equal protection clause under the 14th Amendment. Thank you. Your Honor, I believe that the, the court committed a reversible error in finding another guarantee in Rule 29 on the aggravated identity theft. Now, Mr. Cesar Verroa was found not guilty on count 30, which is the only count that the government was alleging that he obtained illegally his medical license to practice. The court, the reason for the identity theft is that he wrote the name of the patients in the prescriptions, and the government presented three prescriptions. Now, the basis for the without having a legal authority to do so. Now, the only charge that covered that he did so illegally was charge 30, which is the Honest Services charge, which a specific allege that he didn't have, but he obtained his medical license illegally. But, but, but you want us to draw an inference that the Supreme Court won't permit us to draw. The Supreme Court has consistently said in cases like Powell, that if, if a jury verdict is inconsistent on two counts, and there's a sufficiency challenge to the count of conviction, the fact that the count, the other count came out the other way doesn't enter into the calculus. What we've got to do is look at the evidence on the count of conviction and see if that's sufficient. That's what the law is. Yes, sir. So tell us why, tell us why, without reference to the verdict on the count that you claim was inconsistent, not guilty verdict. Why was the evidence insufficient on the count of conviction? Because your Honor, the government is basing the aggravated identity theft, and they're, they're joining that conviction with count 56. No, no, I don't want to hear about count 56. Why is the aggravated identity theft, why is the evidence insufficient? You're missing my point. All right. Just because. What didn't the government prove? That he obtained his medical license, he didn't. So in other words, when we look at the record, there's no evidence in the record taken most favorably to the government that would show that he, from which a jury could find that he obtained his medical license illegally. Correct, Your Honor. The evidence was presented through Yolanda Rodriguez. Yolanda Rodriguez testified that the, some basic skills examinations were equal to that of Judge Smith at Verroa. So then again, Judge, and the government's theory was that Verroa, Verroa used Dr. Solis, and Dr. Solis used Yolanda Rodriguez in order to obtain the medical license. If you look at all the evidence in favor to the government, you will see, number one, that what, that you don't see a connection at least as to Solis and Yolanda Rodriguez, because when Yolanda Rodriguez was asked point blank in cross-examination, whether she remembers of, did she receive anything of value from Dr. Solis, or did she receive anything from Dr. Solis, Your Honor, there is no evidence on the record that she received anything in the case of Cesar Verroa, which is a requirement on the stealing as to the honest services. That may be a requirement for honest services, but that doesn't seem to prevent an inference that the license was obtained fraudulently. It may not have been honest services for it. But if Solis, without a thing of value passing, if Solis brought your client's case to Rodriguez, and Rodriguez did her little magic act and altered the paperwork so that he got a license he didn't deserve, all right? Yes, sir. That might not be honest services fraud, but that's certainly getting a license unlawfully, which is all the aggravated identity theft. Yes, sir. The point being that when you're assuming all the facts favorable to the government, when Yolanda Rodriguez was asked point blank, did Mr. Solis refer to you Mr. Verroa's case? And she couldn't remember. This was the lady who falsified between 50 to 100 test results. And you're right. The evidence pointed that he had test results equal to another individual, but then you say, well, how do I assume that his medical license, he obtained it illegally, and the only thing we can clamp it on is on the charge of countering. Now, let's assume that... See, I thought that you would be here arguing. That no matter how you construe this record, there's no offense of aggravated identity theft. Because this simply isn't an identity theft crime. You know, patient's identity wasn't taken. The patient authorized the use of his identity. The patient got what his identity produced, that is, he got the medication that the doctor prescribed. I thought you'd be arguing that the facts here just don't fit the charge. Judge, I do that in my argument in the brief. I'm just letting you know that also, there's a fallback position to that, and that's a specific value argument in my case. Well, would you please respond to Judge Solis' question? It also reflects a concern that I have. Maybe this is more for the government than for you, but I'm trying to understand... I just looked at the title, aggravated identity theft. It suggests that somebody's identity was appropriated in some way and then used to gain something. Whose identity was stolen here, in fact? I'm having trouble understanding how that concept, if that's a relevant concept, fits into the facts. Thank you for the question. I do explain this in my brief. Please explain it here. Yes, sir. The fact is that there's... My position is, it's only writing the name of the prescription, which they are to do in any type of prescription that a doctor gives you. That's not sufficient because the law in the aggravated identity theft is that you use and possess or transfer that illegally, and then the law ties it up to another charge, which they enumerate at 1028. But the fact remains, Judge, that Mr. Berroa never used or benefited from the only simple issue of putting the name on the treatment, on the receipt. He doesn't benefit. He doesn't start to gain anything by... And that's the charge, using, possessing, transferring. He doesn't start to gain anything on that. And the government might say, well, that's not a requirement. But this is not the typical case where I use the identity of an individual, which is what I use in my brief, to try to get an immigration benefit. For example, this is what I described in my argument. And also, basically, the issue is, well, Mr. Berroa was uninterested of what happened after that document left his office. The individual went to a pharmacy and had his medicine received. There is nothing, nothing here that he used, possessed, or transferred. So, there's a... Well, is it possible that, I mean, when he does the paperwork, I guess, signs a prescription order, he is representing that he is a properly licensed physician. Is that, in portraying himself as a properly licensed physician, is he giving himself an identity that is contrary to fact? Would that be the theory of the prosecution? I think, George, that's obviously the theory of the prosecution, but Dr. Berroa also wrote his name in the prescription. He also explained himself that he wrote his name, but he is representing that he is entitled, on behalf of a patient, to order this medicine because he is a properly licensed physician. Very quickly, George, that would be tied to count 56, which is the mail front. And I'm having difficulty. That's why I reserve my two minutes. I will explain to you why the aggravated identity theft doesn't fit to the count 56, which the government is clamping on the aggravated identity theft. So, I'm going to turn it over to Dr. Berroa, who is going to give us a little bit more  bit more detail on the fraud scheme. Chief Judge Howard, Judge DePez, Judge Selyoff, my name is Robert Andrews. I represent Geraldo Castro Batons. Because Castro is a similar name as to another defendant in this case, I'll be using both his paternal and maternal names in reference to my client. Your Honor, I take issue with the fraud scheme here, and I think that it ties in nicely to the questions about aggravated identity theft. The government's theory is that when you appropriate someone else's name and use it in, say, a scheme to defraud, that that is aggravated identity theft. Your Honor, in my brief, I assert that it's not. And the reason that it's not, even if it were in conjunction with the fraud scheme, is because it's authorized and it is a lawful purpose. Getting prescriptions is simply lawful to patients who need them. It's irrelevant whether or not his medical license was valid. And that's really what's at the heart of this case and what's at the heart of the problem with the fraud scheme. Is the medical license a false statement, or is the false statement really, I passed certain parts of the licensing requirement. What's at issue here is whether or not there is a sufficient connection between those false statements and the object of the fraud, which must be money or property. Recently, the Supreme Court has said that the by means of language in the fraud statute is a limitation on how broad the theory can be. In this case, the government's theory of fraud is very broad. Its theory is that they made false statements to get a medical license. But because fraud requires an intent to defraud for money or property, we say that really their intent wasn't to get the medical license. Their intent was to get paid for being a doctor. That, Your Honor, is what I suggest is beyond the scope of the federal fraud statute. It violates the by means of limitation. Simply because there is money somewhere down the line doesn't mean that that is a by means of connection, which is what Justice Kagan was talking about in Lowell. What was your client convicted of? My client was convicted of mail fraud for sending the letter to SINET, the medical insurance carrier, and aggravated identity theft. He was acquitted of what arguably is the substantive fraud count, which is honest services fraud. Our suggestion is that the problem is not with the difference between honest services fraud and mail fraud. Our version of that, and I think Judge Stelia addressed this earlier when he said, I don't want to know about the connection because we can't go there because we don't see those verdicts as inconsistent. There could have been evidence of the fraud scheme in the mail fraud count. Well, our suggestion is it's not because of the by means of limitation. Our suggestion with respect to the aggravated identity theft is that without the fraud scheme there is no aggravated identity theft because everything was legitimate in the sense that a patient would expect a doctor to provide a prescription, which gets us to what's really sort of at the heart here of the government's theory is what is the false statement? And the government wants this court and asked the district court and the jury accepted that the false statement were that they were licensed doctors. I don't think that that's a false statement here. I think the false statement here, certainly in the case of my client, was that he passed two of the three licensing requirements that he didn't. I don't think that that statement went beyond the licensing board. And if that statement doesn't go beyond the that the government's theory of fraud doesn't meet the by means of limitation imposed by law. The issue here is what right is in that medical license? If we look at Cleveland, which is a 2000 case, Cleveland says that a license can't be an object of mail fraud because it's not money or property. That's what limits the government here and why it must be the money that they are going to receive for their services. Those limitations are by means of limitation is already being hinted at in Cleveland. And I understand that certainly in this case in the United States or in this circuit in the United States versus Doherty that this doing this to get money. And for me, there's a distinguishing factor there. In Doherty, it was police officers who were getting false exam results to get promotions. And that meant that the money was coming directly from the municipality. Here, there's very limited evidence of where the money was coming from. There isn't someone who comes and says, yes, we're paying Mr. Castro-Baton's money for his services. And we're upset because we don't feel that we got those services, that those services were somehow fraudulent. In the government's theory, that's because he wasn't a real doctor. Although we suggest that Cleveland is pretty clear that just because there's a regulatory scheme that the state interest is protecting doesn't mean that it changes the character of that. It doesn't make him a doctor or not. It makes him able to practice medicine in a particular jurisdiction. And the question is, and I think the court has certainly assumed for some purposes that that's fraud because that's a false statement. He wasn't licensed and therefore the deception is he's a medical doctor. But he was a medical doctor because he went to university, he had learning, and he was able to act as a doctor. And whether or not he's licensed is really irrelevant to the issue of it being a fraud. And that is what we assert in our brief and that's what we ask this court to recognize. Your Honor, unless there are specific questions, I'll rely on what I said in my brief. Thank you. May it please the court. My name is Tiffany Monrose and I represent the United States. I just want to begin by addressing some comments that Attorney Bonini, Julio Castro's attorney, made here at Oral Argument today. She argued that her client's due process rights were violated because they were not entitled to have copies of transcripts and that she made numerous attempts to obtain copies of transcripts prior to or during trial. I just want to inform the court that Judge Serafo issued an order authorizing the approval of the transcripts of the opening statements and of specifically identified witnesses. I don't have the date of the order, but that was in the minutes of proceedings where she specifically authorized, she specifically stated that if they made the request, she would approve it. And in this case, the only defendant who argued that her due process rights were violated was Glenda Davila. None of the other defendants in this case had the right to have the transcripts and none of the other defendants who had appointed counsel argued that their due process rights were violated and Glenda Davila had retained counsel. In this case, the only reference that Julio Castro made to not having transcripts was in the context of arguing that a mistrial should have been granted based on the fact that the jury heard the testimony of Guillemina Velazquez, which included a sidebar conversation. And I will briefly, very briefly, read to you what the brief says regarding that. Hence, there is no defense counsel in our God-loving nation who can remember all and every aspect of the testimony herein provided. Thus, it would be unfair to expect the counsel to remember the entire record without the aid of the transcripts. I agree that you cannot remember every word uttered in a 41-day trial. However, that statement means do not hold it against us that we did not identify that the sidebar conversations were being repeated to the jury. And the trial court gave explicit instructions to the clerk, do not read sidebar conversations. Only read the questions and the answers. And the purpose of filing this motion for a new trial, I'm sorry, for a mistrial was because the jury heard it. The jury heard the sidebar conversations. The essence of what they heard was that the dates that Julio Castro failed the board exam, which was November 2002 clinical exam. However, we know from the transcript that Guillemina Velazquez stated, I don't know from personal knowledge the date, but I found out from a document that it was November 2002. So there was no grounds for a mistrial. Her attorney, I'm telling the court because I didn't want to interrupt. She knew that portions of the sidebar conversations were being read to the jury. And even though the judge called the jury back into the courtroom and told them that to consider Guillemina Velazquez's testimony along with the testimony of other witnesses, she never raised the argument then. The jury left. She raised the motion for a new trial. She didn't inform me that the jury heard this sidebar conversation and you were aware of it. She acknowledged that at trial. Yes, I was fully aware. She did review the transcript to identify for the court line and verse where those sidebar conversations came in. However, we know also that Dr. Ruben Velazquez, the statistician, also testified as to the date when Julio Castro failed the board exam. So there's no prejudice. So in this case, I would ask the court to deem ways Julio Castro's argument that his due process rights were violated because he did not make this argument in his brief. The only defendant who did was Glenda Davila and her counsel was retained. And I would submit that the CJA does not apply to defendants who attorneys are retained rather than appointed. I would like to address the issue of sufficiency of the evidence. Before you go to that generally, could you explain to me what the government's theory of aggravated identity theft is in this case? Absolutely. In this case, the court, the government argued that the physicians, Barrera and Heraldo Castro, the persons who were convicted, I'll just address theft during and in relation to mail fraud. And just whose identity did they steal or misappropriate? They used the identity of their patients. Without permission? They used it with permission, but this court has... Excuse me. Yes. So I'm struggling to see where there's a misappropriation of the identity. Well, I would submit that this court in Ozuna-Cabrera determined that even with a person's consent, the use of a person's identity or name can be unlawful and in violation of 18 U.S.C. 1028A. And in this case, although the patients provided their name to their physician for the purpose of obtaining prescriptions, the use of their name on the prescription was in relation to mail fraud, which was obtaining their license fraudulently. If they did not obtain their license fraudulently, they would not be able to issue prescriptions. And we know from the testimony of Sylvia Castro... That's pretty attenuated, isn't it? I would submit no. So that virtually anything that they did was in relation to mail fraud on that theory. It wouldn't matter, all right? This was the prescription. If they called the druggist to facilitate the prescription, that's also an aggravated identity theft crime. I don't see where the limiting principle is if we allow the government to indict for that crime in circumstances like this. Well, there are certainly limitations just based on the circumstances of the case. We know that in this case, a physician is going to issue prescriptions and going to... But I'm looking for a limiting principle. You're saying that once you fraudulently obtain a medical license, any time you use someone else's name in connection with anything that you do under the guise of that license or under the umbrella of that license, that's aggravated identity theft. If you order medical supplies, that's aggravated identity theft, all right? Presumably, if you lease a car, that would be aggravated identity theft because you want the car so you can make rounds to see your patients. I just don't see where this stops. Yes. I would just look at the language. The language of the statute says it must be and in relation to. The government argued that it was in relation to obtaining fraudulent medical licenses. Can I ask you a question about that? Ozuna Cabrera is the case that you rely on, and in that case, the identity, although obtained with the acquiescence of the true owner of the identity, it was used to deceive in terms of who was making the application. I think it was here. We don't have anything like that, right? I mean, there's no deception with respect to the picture. Is there any case that suggests that using the identification papers in a non-deceitful way falls under the statute? I mean, I assume you cited to Ozuna because that's your best case. Yes, I did decide to Ozuna because that was the best case that I found, but I don't see in the plain reading of the statute that it requires some sort of deceptive use. I think the deception is related to one of the enumerated felonies, and the deception in this case was the mail fraud. If I read it to imply that, certainly that would present a different set of circumstances. It was just the knowing an unlawful use, not the knowing an unlawful deceptive use. No, I don't think your argument is insubstantial, but to rely on Ozuna, which really was quite a different set of facts, gives me some pause. Counsel, if you say that the premise of the aggravated identity theft is the mail fraud, one of your opponents pointed out that, at least for his client, the defendant was acquitted of the mail fraud charge. Now, that sounds a little different than an inconsistent verdict issue. The way you just articulated the theory of aggravated identity theft, it's in relation to another felony. If the defendant has been convicted of that felony, that the aggravated identity theft is in relation to, doesn't it follow from that, that the aggravated identity theft conviction cannot stand? Well, there's something that I need to clarify, Your Honor. In Barrera's brief, he argued that his acquittal on honest services mail fraud conspiracy is inconsistent with his conviction on aggravated identity theft. The predicate offense in the indictment is mail fraud, not honest services mail fraud conspiracy. As a result of that crime being the predicate offense and Barrera being convicted of the predicate offense and the compound offense, there's no inconsistency. The honest services mail fraud acquittal has no relation to his identity theft charge, his conviction. And that's something we know, even from Powell, that if you're acquitted on your predicate offense, you can still be convicted on the compound offense. But in this case, he was convicted on the predicate offense of mail fraud as well as the compound offense of aggravated identity theft in relation to mail fraud. And that was the allegation in the indictment. I think that, you know, Barrera kind of confused the two, and I may not have painted the best, the clearest picture, but the truth is that he was convicted of mail fraud. He was, and he essentially argued that he was convicted of mail fraud, and he was convicted of aggravated identity theft, and therefore there's no inconsistency in this case. And I would submit to the court that there was sufficient evidence to convict Barrera, Geraldo Castro, and Julio Castro of mail fraud. In this case, the defendants engaged in a scheme to deprive their patients of money after they fraudulently obtained their medical license and caused the use of mail in furtherance of that crime. As part of the scheme, these defendants paid for false passing grades of their board exams. In order to practice medicine, they all sought professional liability insurance from CEMED, and they asked the board to send CEMED a copy of their Certificate of Good Standing along with an envelope showing to send the Certificate of Good Standing. Admitted as Governments Exhibits 47 through 49 were copies of the Certificate of Good Standing and the corresponding envelope provided by Barrera, Geraldo Castro, and Julio Castro. In this case, we know that the appellants had identical raw score results of other applicants. Dr. Ruben Velez testified that it's more likely to win the lottery than to have identical score results. In fact, he said the chances is 1 in 47 million. That can be found on page 3854. Well, that may be true, but how would maybe this question is too general, but how would the defendants know of that improbability? I mean, for example, the argument that's made on behalf of Davila suggests that she was simply told that by a colleague that there was a way to expedite her request for a revision of the failing test score, and she paid $300 to the individual who said that he could help, and then she does get a result that indicates she's passed, but she has no idea how that happens, and there's nobody at the board who can testify who has any recollection that she had any contact with any of them. So, what would allow a jury to conclude in that scenario that she had any understanding how that improbable test result came about? We do know in this case that when Glenda Davila came to the U.S. Attorney's Office and she met with Special Aide Benagraia, she informed him that she agreed to give Danny Solis $300 to advance her to the third part of the board exam. She already knew at that point that she had failed the November 2002 clinical exam. Excuse me. I gather she had requested in the normal course some kind of a revision of that result. Is that correct? She did request a revision, and that was made a part of the record as we admitted it, and there was no evidence that she passed the revision, and she knew that she had not passed the revision. So, giving someone $300 to advance you to the third part of an exam when you... Excuse me. What evidence is there that you knew she had not passed the revision? Well, she told, through the testimony of Special Aide Benagraia, she, during the course of interview at the U.S. Attorney's Office, she informed him that she had taken the revision exam. She had applied for a revision, and that indicates that she knew that she failed the exam. How does the fact that she had taken the revision indicate that she had failed the revision? It indicates she knew she had failed the original exam, but how did... It seems to me that you said that she knew that her attempt to revise also had failed. Well, she was notified that she had failed in revision, and that was part of her board file that was admitted at trial. And in this case, she had no reason to believe that Danny Solis could assist her in essentially bypassing the normal process of either passing the board exam or passing a revision. Once you have failed a revision, do you have any other... for you at that point? You don't have any other recourse. And I would submit to the court that through the testimony of Yvonne Fernandez, a member of the board, she testified that people did not receive a passing result in revision. So the result that was produced showing a passing score was inconsistent with her testimony that the board has a practice of notifying applicants that they've passed or failed in revision. There's no score result. Dr. Rubin-Velez does not create a score list which shows whether or not you've passed the revision with an individual score. And that was not contradicted by... So she was notified that she had failed. Yes, she was notified that she had failed, and that was a part of her board file. And then until she was approached by Solis, she had no idea that she had any other recourse to try to get a different outcome. Is that correct? I'm sorry, can you repeat the question? Sure. She had been informed that she had failed the revision exam. So until she was approached by Solis, who said he could do something for her, she had... As far as she knew, she was through. There was no other way she could get a medical license. Is that correct? That's correct. The only defendant in this case who did not have revision documents in their file was Reza Pacheco. And so there was no basis for her to believe that somehow if you just give someone, another doctor, $300, you can somehow pass and go forward after you've been notified that you failed in revision. There's no basis in the record to support that. None of the witnesses identified by the defendants indicated that that was a process that was normal at the board. So just to help with it, so after she pays the $300, what does she get by way of documentation to tell her that she has now in fact passed this exam? Well, what she has is she... Danny Solis provided her with a score result that showed that she had passed with 709 on the same exam that she knew that she failed. On the same exact form document with her raw scores, it now had different numbers showing a different pass score. And when she went to the board, she asked for grade certification to confirm that she actually had this information in her file before she applied to take the third part. She essentially wanted to make sure that she got her money's worth. And she went to the board and they gave her the grade certification that she knew at that point, but she could advance to the third portion in the board. Because it would look suspicious if you failed and you're now requesting to complete the practical exam. Why isn't that just prudent on her part? What is criminally culpable about wanting to confirm that she has passed? What's criminal about that? No, I wouldn't say that that was criminal. It was criminal to provide Danny Solis with $300 in order to take the practical exam. That's the crime. The crime is not confirming that you've passed. The crime is actually... That just shows that she... Wanted to verify that the scheme had actually worked. That was the real purpose of the grade certification. So this is... You can say this is a jury issue. When she gave that $300, there wasn't anything innocent about it. She understood that you would argue that something untoward was going to happen that would not allow her to get a good result. Is that correct? Absolutely. That's my argument. An attorney wouldn't say, well, okay, for the second... I can give you $300 and now all I have to do is take the essay portion of the exam. You would think that something untoward would have to happen in order to make you exempt from taking a required portion of a professional exam. And in this case, we have the testimony with respect to the other defendants. One issue that I definitely want to address is prosecutorial misconduct. In this case, Davila lodged an accusation of prosecutorial misconduct based on the fact that the prosecutor stated that there wasn't an innocent explanation for... Excuse me. There wasn't an innocent explanation as to the false results for their clients and it was identical to results of other persons. Now, at least two of the defendant's attorneys have stated that the government's argument was based on the fact that there were irregularities of the board. That was not the case at trial. It was that they paid for false passing grades. Their common defense theory during opening statements at trial and in closing was that there were irregularities at the board that somehow contributed to their client's results. We know that Guerrero's attorney in his opening statements directly stated that the irregularities at the board affected his client's results. Now, what they tried to offer in terms of proof at trial included the illicit testimony from Yvonne Fernandez. Now, Yvonne Fernandez was asked whether or not an answer key was found in the lady's restroom and whether or not that was irregularity. She acknowledged that it did occur and that it wasn't irregularity. They also attempted to elicit the testimony through Elba Flores, a secretary at the board, and asked her whether or not she was asked to prepare a letter by Pablo Valentin passing a failing candidate. She acknowledged that that happened, but none of these, the candidates were none of the defendants, and there was no testimony which showed that the answer key that was found in the restroom had any relation to their false passing scores. Excuse me. What was found in the restroom? There was an answer key to one of the board exams, so for maybe the morning portion of the exam, the answers that were for that part of the exam was found in the restroom, the lady's restroom. There was no connection between that answer key and any of the defendants' false passing results. The defendants also offered the testimony of Dr. Rafael Jimenez, Pablo Valentin, and other witnesses. Now, when they questioned Dr. Rafael Hernandez, they only asked him really one question that came to the essence of irregularities, where he received a letter from Dr. Ruben Velez saying that they need to address issues with the revision process, but they never asked him to elaborate what problems or what issues were involved in the revision process. We do know that when Pablo Valentin testified at trial, he was questioned about actions by Gregorio Diaz with respect to changing grades for persons. Now, Gregorio Diaz did change grades for certain persons, but none of those persons were any of the defendants in this case, and Pablo Valentin stated that he didn't work with Ivan Rodriguez, the board or he had knowledge of anybody else being involved with irregularities at the board or changing of grades that affected any of the appellant's false passing results. In fact, defendants' exhibit, CC, was a letter from Pablo Valentin stating he identified people in which he was involved with affecting their score results. It didn't include any of the defendants in this case, and he said other than that, he had no other knowledge of irregularities at the board. So the defendants basically, in opening statements, teased the jury with the idea that they were going to present evidence of irregularities, and they attempted to do so. Now, they'll tell you that they were limited in their efforts, and as I stated, Elba Flores, one of the people who they attempted to elicit this testimony, her testimony wasn't relevant. It didn't have anything to do with any of the defendants, and therefore, when the court limited the marginally relevant line of questioning about whether or not Pablo Valentin asked her to alter the passing results of Lopez-Gosini, it had no bearing on this case. When the defendants made these open statements in which they promised that there would be evidence of widespread irregularities, had they sought pre-trial and some form of eliminate proceeding to get permission to have witnesses come forth who would testify to these irregularities? Did they already know that they were going to be limited in trying to make that case of widespread irregularity? Well, I don't recall from the record. I know that they had identified several witnesses, including some of the people that I identified. Rafael Jimenez and Gregorio Diaz and Pablo Valentin. They identified them at trial. These witnesses asserted their Fifth Amendment rights. There was a hearing in April regarding Rafael Jimenez as well as the other witnesses where they basically asserted that with respect to certain questions, they were going to assert their Fifth Amendment right because they could be prosecuted locally by the Puerto Rican authorities for forging documents, forging licenses, and things of that like. While they were able to assert their Fifth Amendment rights, they did still testify at trial. And their testimony was expected to speak to irregularities that affected these defendants. That evidence never materialized. So therefore, the prosecutor was making a logical counter to statements that were made in the opening, evidence that they attempted to elicit at trial, through government witnesses, through their own witnesses, that never materialized. And even in closing, Barrera again reiterated that the irregularities were at the board. In closing, they stated that the prosecutor, Ruiz, said that the board was a mess. But he said that the board was a mess because you have the president of the board passing people fraudulently. You have the executive director passing people fraudulently. And that the board was so vulnerable that it was so easy to engage in the scheme that it only required scissors and tape. Essentially, cutting and pasting, passing scores, and superimposing them on failed score sheets. And in this case, there was no limitation of their ability to present their defense. The appellants would like you to believe that they were limited. One instance that they identified was that through the testimony of Dr. Velez, they questioned him regarding the burglary at his home. The government didn't make any objections to his testimony, and they were able to offer in It's unclear how they were limited in presenting their defense. In the third incident, a special agent at GAIO was asked about irregularities involving Danny Feliz. He testified, and then they asked him about any other irregularities. The government objected. The court sustained the objection, and they felt that this somehow limited their ability to present a defense. But the government's objection was based on the fact that this went beyond the scope of direct, and that's what the defendants attempted to present before this court. And even in the case of Yvonne Fernandez, they asked her, well, were things done the way they were supposed to be done? And it was very sort of nondescript. Were things really being done? And the court asked him to be more specific. What things are you referring to? And they took issue with that. They took issue with the fact that the court just wanted them to be specific. Are you referring to revisions? Are you referring to scoring of the test? Are you referring to notifications? Those are the questions that come to mind when I hear that phrase, were things done the way they were supposed to? They believe that that was a limitation of their ability to present their defense because the government raised an objection, and the court required them to be more specific. After being more specific, the court allowed them to continue their cross-examination. So it's unclear really how they were limited. And just going back, this case involved the government presenting evidence of other persons who had similar score results to the defendant. And the purpose of offering those similar score results was to show that there was a scheme that, you know, like I said, it was highly unlikely that two people would have the same results, but the government wanted to show that this was a part of a fraudulent scheme that occurred at the board and that the defendants had results of other people that they did not earn. And the government was able to show the true passing candidate and how other persons, we know in this case Barrera and Zavala have the same raw scores, the same exact raw scores for each category on the clinical exam. How is that possible? According to Dr. Velez, the one in 47 chance, you have a one in 47 million chance of that happening. While the defendants didn't know about that probability, we know that that's a statistic, the statistical probability he assigned to the likelihood of something like that happening. Now the defendants would like to argue that, you know, somehow that violated 40B, but I would submit that the evidence was intertwined and intrinsic with the allegations in this case, which is that there was a scheme to obtain false passing scores, that Yolanda Rodriguez testified that her practice was to cut and paste false passing scores and superimpose them over failing scores. She most of the time did it at OfficeMax. The one time when she got caught was when she did it at the board's office and they saw this document attached together. Did she testify that she had a memory of creating these passing results for every one of the defendants here today? No, she only recalled providing false passing scores for Verrera and Pacheco. Through the testimony of Margarita Vecchioso and Rodriguez, we know that she obtained a false passing score. Rodriguez testified that she recalled fabricating Verrera's score. He got the assistance through Nestor Baez and his brother, who would respond economically to provide him with a false passing score. Okay, so if she did, was there testimony from an intermediary that they had acted on? Rodriguez did not recall all the defendants. Was there at least testimony from an intermediary that they had acted on behalf of all of these, each of the defendants? Yes, we know that Verrera, Miguel de Alca, I'm sorry, Nestor Baez testified that he assisted Verrera with obtaining false passing scores, and Rodriguez obviously testified that she fabricated the score. With respect to Julio Castro, Vilamina Velazquez testified that she received a cash envelope that she believes contained money, which she gave to Solis on behalf of Julio Castro. We know with, I'm sorry, with Gerardo Castro, Miguel de Alca testified that he assisted his friend by giving, and assisted his friend with obtaining a false passing score in the April 2004 basic and clinical exam. And through the testimony of Margarita Vecchioso, she was able to inform the jury that she received $3,500 from Beaza on behalf of Rodriguez. She provided that, and she testified that she provided that money to Rodriguez. I'm not sure if there are any defendants that I haven't covered, but I believe that there was sufficient evidence to demonstrate that they had engaged in mail fraud, I'm sorry, mail fraud in this case. With respect to the other issues, the defendants wanted the court, and found that the court erred in not granting their request to admit the memorandums of investigation. We know that they wanted to get the memorandums of investigation admitted at trial because their witnesses had now stated that I'm going to raise my Fifth Amendment right, and I'm not going to testify as to anything that would implicate me. In this case, the memorandums of interview were the statements of the agents. They were not based on personal knowledge of the agents. They were not drafted, prepared, signed, or adopted by any of the witnesses. And the witnesses that I'm referring to are Dr. Rafael Jimenez, Pablo Valentin, and Gregorio Diaz. When you say they weren't based on personal knowledge of the investigators, is that because it was other investigators who did the interviews? Well, no, the information that they wrote in their reports was not based on personal knowledge. It was based upon statements of the person being interviewed. So, Gregorio Diaz would tell, say, for example, Agallo. I'm not sure if that was the investigator that he spoke to, but for example, he would tell the agent that I know that Jimenez and Valentin altered scores. Now, the agent did not have basically changing the fact of who actually was at fault. And in this case, they wanted to have these statements admitted as statements against interest, but we do know from the memorandums of investigation that a lot of the statements were not against their interest. And the Supreme Court in Williamson stated that the statements have to be independently and documents that implicate others are untrustworthy. Now, in this case, Valentin downplayed his involvement in the case. He didn't take outright responsibility in the memorandum of understanding. And I'm referring to the July 11, 2007 memorandum. I'm confused. I thought these weren't statements at all. I thought these were the agent's notes of their but they refer to it when they put it in a formal document, they refer to it as memorandums of investigation. And essentially, these are notes that are made by agents all the time. It's not recorded at the time when the interviews are taken. Oftentimes, it's often days after the interview was conducted, and it's not verbatim. So you don't have an instance where in any of these memorandums where they were the exact word for word of every statement made by the individual being interviewed. Now, there were some quotes that were taken from the interviews, but the bulk of the statements that were included in these memorandums were not verbatim. So they were basically summaries of the agents. And they wanted to offer this into evidence. And the court did not err in excluding these documents because they were not against the interest of the person being interviewed. And I'm referring to the three witnesses that I identified. All but one testified at trial, and Gregorio Diaz did not testify at trial, but the other ones were. So they were able to elicit whatever testimony they thought that they could regarding irregularities, but it still did not link up with their common defense theory in this case because there was no link, no link whatsoever showing that anything that happened, altering the score sheets, you know, problems with Julio Castro, Davila, or Pacheco. There was no evidence that created any sort of link in this case. Now, there were several times where the court sustained objections on behalf of the government, and the defense would like you to believe that, you know, there was some sort of judicial bias. In one instance when the court indicated that evidence was irrelevant, they accused the court of being biased. So we know from a Supreme Court decision, even statements of anger by a court, cannot be perceived as judicial bias. And in this case, there were instances, at least once, where the judge asked one of the defense attorneys to please be seated. This was after making four objections in closing, in short succession of each other, basically challenging issues that were not issues. At one point, the prosecutor showed a copy of an envelope that was provided to the board and said, that misstates the evidence. An object misstates the evidence. That's the kind of objections that they were making. They also objected to the fact that there was a reference made by the prosecutor that the patients believed that the doctors had privileges. The government had offered a trial that Pacheco had a letter, had received a letter from Doctors Community Hospital showing that she had privileges at the hospital. And the final objection that, one of the other objections that the defense made was to the government's summary of aggravated identity theft. They felt that the government had misstated the law, but I would submit that it was consistent with the outline of 10, the elements in 18 U.S.C. 1028A. Now, in this case, Geraldo Castro also argued that his case was improperly joined. I would submit that he has to show, based on, under plain error, that the court erred, because he did not make this argument at trial. In this case, there was a common scheme which justified including all of the defendants to be tried together. We know the common scheme was paying for false passing scores, and we know that they had some common players within this case, either Danny Solis or Yolanda Rodriguez, and it would be a great benefit to the government to not have to present six trials with substantially the same witnesses from CEMED or the board, basically showing what the process was at the board, who applied for insurance, and, you know, essentially the evidence would overlap. And there is case law to support that this sort of garden fire variety of prejudice that Geraldo argued would not suffice to justify severance. In this case, I'm sorry, in Baltus, this circuit has held that even if large amounts of testimony is relevant to one defendant, it does not justify severance. And, therefore, I don't believe the court erred in having all the defendants tried together. And we know from the jury instructions that the trial court instructed the jury to that all defendants did not receive, weren't convicted of all the crimes. Some defendants were convicted of one crime, some were convicted of mostly all, and some were only convicted of two. So there is an argument to be made that the government, that the jury was not confused and overwhelmed by the evidence presented. They were able to discern case by case which would like this court to believe that the trial court erred in the granting and not compelling the government to grant immunity. But the district court stated in its order that there was no showing that the government intended to harass or intimidate Rafael Jimenez from testifying. There was also no evidence that the government purposely withheld any exculpatory evidence that Dr. Jimenez might offer. So the court rejected that argument. Because, essentially, the defendants were arguing, well, this is how we're going to present our case. This is our best case scenario to offer this. And this court has held that even when a witness can offer clearly exculpatory testimony, indispensable to the defense, and the government has no reason to withhold immunity, the trial court is not authorized to compel the government to grant immunity. And that's from the case of Castro. And the court rejected the effective defense theories in Doolal and also, I believe, in Mackey. The government will rest on its brief unless the defense is willing to grant immunity. I would like to briefly clarify some matters that the court asked. Judge Leifess asked regarding an in limine order. There was no in limine order. The court was aware that the defense was going to present Jimenez and Villas and Valentin as defense witnesses. The government never moved for in limine of those testimonies in any way. In the trial, they did file a motion asking the court to rule that all of those testimonies were irrelevant. The court initially ruled in the government's favor some issues, then modified the order, and that's why the witness came in to determine what the privilege they were going to claim. Again, I will stress that the government, particularly Jimenez, I want to clarify, he never testified trial before a jury, to the best of my recollection. Jimenez received direct use immunity first, then had a lien cooperation agreement with the Margarita and had the cooperation agreement because he was going to testify in the Margarita case. He was a witness as to Margarita's misconduct at the board. It's in the record, our motion for mistrial reflects, Mr. Ruiz appeared in the Margarita trial and was directly asked whether he was going to use Jimenez. He said maybe. So the government was considering using Jimenez. Just two months before, Mr. Ruiz on the record again said to Judge Cereso, we're not going to use Jimenez as a witness. There's a difference. Plain semantics goes, gets no one anywhere, but the fact is Jimenez was considered a potential witness of the government from the first day. I would like to conclude, Your Honor, with the jury's instruction regarding gift. The gift word was not placed on the record by Ms. Pacheco. The gift word was used by Ms. Rodriguez on many occasions. In some occasions, she will ask for more than $3,000 to do the scheme. In other cases, she didn't ask for anything. Other cases, she asked for a gift. It's a gift of bribe. Particularly in this case, when the government speaks about the scheme, but there's not a pattern of bribes because there's a single bribe or alleged bribe in each of these conspiracies. While the government originally wanted to try this case as a single encompassing conspiracy, which they had to dismiss, when they were forced to try individual conspiracies as to Pacheco and other defendants, they still tried the case as a single encompassing conspiracy, as a single scheme with many bribes. That simply wasn't true for Pacheco. In any case, there was not sufficient evidence of a bribe as to her. Thank you. I just have to do a very quick point. I know it's a huge record and mistakes will be made but the prosecutor made two egregious factual errors in her presentation. The first is, she said that Mr. Veal and my client was notified that she had failed in revision by the board. That never happened. There's no record. There's no evidence in the record, period, to that effect. I outlined all the documents. I listed them in tabular form. There's evidence to that effect recounted in my brief. My client was never informed by the board that she had failed in revision. The second point is, I forget which judge asked if there was any recourse after, if you did fail in revision. The prosecutor said, no, in fact, there is. It's right on the form that is sent to apply for revision. If you fail in revision, you may ask for reconsideration, which is a subsequent procedure that the board does informal revision processes called VIP revisions that were being done by the board privately. All getting to this one simple point. My client did not know what was going on at the board. Why isn't that a jury issue? I'm sorry? Why isn't that a jury issue? What her understanding was, she suddenly asked to give $300 and something can happen. It's a very odd circumstance. Why isn't that up to a jury to she understood that something unusual was going to happen to get her a successful outcome. Well, it is up to the jury, but the jury has to be rational. That's the Supreme Court standard. I think this is just piling one inference upon another and saying, because things turned out to be bad, she must have known and entered into a conspiracy to create those bad things. There's no evidence in the record to support that. Thank you. We have H.M. Monserrat. Judge, continuing with the aggravated identity test, I just want to specifically express to you that the identity test has to be tied to another crime of this type. In this case, Count 56, the male fraud. I don't see how three prescriptions that were done a year after Count 56 could be furtherance of Count 56. Count 56 is the cost the board to send a medical goods patent certificate to the insurance company. This happened in August 23, 2005. The requirements for a medical license are expressed in the government brief and my brief. There is not one single medical requirement for the board to issue a license that you have medical insurance. There is none. How come they can satisfy or allege that this took two years, the Count 56, when all they're saying is that on, specifically, August 23, 2005, you cost one million from the board to submit. These prescriptions, which were not used in a deceptive manner, are a year after August 23, 2005. It's impossible, Your Honors, that the aggravated identity test, the requirement that being further off that you can't even help Count 56. There is not one single requirement here, Your Honors, that we require a medical doctor in Puerto Rico to maintain his license. The government has not alleged any. I don't see any requirement that he has medical insurance to maintain his license. So it's incredible that the identity test. Thank you.